**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3497-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TIMOTHY D. SIMON,

     Defendant-Appellant.

_____

Argued April 20, 2026 – Decided May 11, 2026

Before Judges Sabatino, Natali and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 18-12-3010.

Zachary G. Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Zachary G. Markarian, of counsel and on the briefs).

Thomas M. Caroccia, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Attorney General, attorney; Thomas M. Caroccia, of counsel and on the briefs).

Appellant filed a supplemental brief on appellant's behalf.

PER CURIAM

Tried by a jury, defendant Timothy D. Simon appeals from his conviction of first-degree murder arising out of the 2010 death of his girlfriend, Lawanda Strickland. The trial court imposed a sixty-year sentence, subject to the parole ineligibility period prescribed by the No Early Release Act ("NERA"), N.J.S.A. 2C:43:7-2.

On appeal. defendant presents numerous arguments in both his counseled and uncounseled briefs. For the reasons that follow, we affirm defendant's conviction and sentence.

## I.

## A.

The proofs at trial included the following evidence.

The Homicide

On the morning of July 10, 2010, defendant called 9-1-1 to report the death of his girlfriend, Strickland, stating that he found her in her Camden apartment "lying on her left side facing the back of the couch[,] with a blanket pulled up to her chin[,] holding a [twenty-two-]ounce Colt 45 malt-liquor beer bottle" that was "[ninety-]percent empty."

A-3497-22

At around 8:50 a.m., an EMT for University Hospital, Amy Pacione, responded to a dispatch to Strickland's apartment. Upon arrival, Pacione found Strickland deceased on her couch, half covered in a blanket. After assessment, Pacione concluded that Strickland "had been passed for some time."

Sergeant John Ellis of the Camden County Prosecutor's Office ("CCPO") arrived shortly thereafter. Ellis noted that Strickland was "in full rigor mortis," and she had "an abrasion on the right side of her face."

Ellis testified that, as Strickland's body was moved to transport her to the medical examiner's office for an autopsy, a liquid "purge" fell from her mouth. He explained that such "purge" often expels from the body after death and typically presents as a frothy or foamy substance with "a very sour smell, like bile." However, Ellis believed that here it was "more than just purge," and rather "smelled like straight[-]up alcohol." Lieutenant Paul Audino of the CCPO Major Crimes Unit also responded to the scene and reported similar findings as Ellis.

Defendant was present and sitting on the apartment porch during these events. He agreed to give an official recorded statement at the CCPO to Audino and Detective McCausland of the Camden City Police Department, which was later played at defendant's trial.

A-3497-22

Although Lieutenant Audino assured defendant he was "not in any trouble" while giving his statement, Audino nonetheless read his Miranda[1] rights, which defendant acknowledged in writing.

In his Mirandized statement, defendant told Audino that he lived with Strickland and that she was his girlfriend. He explained that they were having "problems" due to his drinking habits, and Strickland had ejected him out of the apartment a few days before her murder.

According to defendant, on the night before he discovered Strickland deceased on the couch, Strickland had dropped off her two young daughters from a previous relationship to stay with a friend. Strickland came home to her apartment around 5:00 p.m., and defendant arrived around 5:30 p.m. with some Chinese food for himself.

As recounted by defendant, Strickland made herself dinner and took two "big" bottles of Colt 45 malt liquor upstairs. Around 9:00 p.m., defendant "snuck off" to a liquor store to buy a bottle of gin and returned to Strickland's apartment. He finished the bottle and put it atop a kitchen cabinet. Strickland

---

[1] See Miranda v. Arizona, 384 U.S. 436 (1966).

A-3497-22

came downstairs and caught defendant drinking; they argued, and she went back upstairs with another bottle of Colt 45.

Later that evening, defendant explained that he and Strickland had sex upstairs, downstairs, and on the floor, recalling that "everything was good." After that, they talked and then argued about defendant's drinking and how he did not treat Strickland's family "right."

The argument with Strickland continued, but defendant stated that it did not get physical. When asked by the police if he knew how Strickland received the red mark on her chin, defendant responded "no," and suggested that it may have been from waxing her hair.

Following the argument, around 2:30 a.m. on July 10, defendant left Strickland's apartment and drove to his friend Malcolm Mackey's[2] house in Paulsboro where he slept in his car in the driveway. Defendant explained that he did not feel safe sleeping in his car in Camden, and that he had stayed in his car instead of contacting Mackey to sleep inside his house because it was late at night.

Around 3:54 a.m., defendant left Strickland a voicemail message. On his way back to Camden, defendant called Strickland again without answer.

---

[2] Later testimony referred to Mackey as "Malcolm Lackey."

A-3497-22

Defendant then reportedly drove to the house of another friend in Camden, Akbar Streater, where he slept in his car until 6:30-7:00 a.m.

Defendant stated that he then drove to a bar he often visited called the "Off Broadway Lounge." He called Strickland a few times while he was there to ask if she wanted him to bring her breakfast. When Strickland did not answer, defendant drank four or five beers while he waited for his food, and then returned to Strickland's apartment.

Upon his arrival, defendant allegedly noticed that a coffee table had been moved, and that the downstairs carpet was professionally cleaned. He knew the carpet cleaning had been scheduled but did not anticipate it happening so early in the morning. He explained that the only other person with a key to the apartment was a neighbor who assisted with organizing the carpet cleaning.

According to defendant, when he saw Strickland on the couch "not breathing," he started "slapping her" to wake her up and called 9-1-1. He "hollered out to the maintenance guy" for help, referring to Kevin Smith. Defendant lifted Strickland's head, attempting to resuscitate her, but claimed that Smith told him that Strickland was dead.

Other witnesses detailed the events of the evening. Shante Parker testified that on July 9 at about 5:30 p.m., Strickland dropped her children off at her home

6

for a sleepover to celebrate Parker's daughter's birthday. At that time Parker saw no "marks or injuries" on Strickland's face.

Carol Cotton, Strickland's neighbor, also saw Strickland that evening, uninjured. Cotton testified that she and Strickland drank beer together at times, and, while she never saw Strickland drink a Colt 45 beer, she had seen defendant drink Colt 45 beer.

Defendant's friend Streater testified that he and defendant were part of a "breakfast club" at the Off Broadway Lounge, where they frequently met to drink alcohol and eat breakfast. Streater testified that on the morning of July 10, defendant mentioned "[m]ore than once" that he was "[t]aking his girlfriend home some breakfast," which he had never done before. Surveillance video showed defendant arriving at Off Broadway at 7:03 a.m. and leaving at 8:36 a.m.

Tamala Kearney, Strickland's work supervisor, testified that defendant called her unit at South Jersey Health Care Center to ask for Strickland between 8:30 and 8:45 a.m. the morning of July 10. Kearney recognized defendant's voice because he routinely called the unit "nine or ten times during [Strickland's] work shift," and would say "can I speak to Lawanda Strickland" or "put her on the phone -- put Lawanda on the phone." That morning, however, Kearney testified that—for the first time—defendant "asked if [Strickland] was there."

7

Strickland's apartment maintenance worker, Raymond Brown, testified that Strickland arranged for him to let the carpet cleaners in to her apartment around 8:00 a.m. on July 10. When they arrived, Brown entered Strickland's apartment through the back door because the front screen door was locked from the inside. Brown allowed the carpet cleaners to enter from the front door.

According to Brown, he did not notice Strickland lying on the couch but noted that there was a quilt on the couch. He believed Strickland was at work. Brown left the carpet cleaners to do their job in Strickland's apartment and returned to his work in another unit.

The carpet cleaner (Tyrone Joiner) testified that he and his teenage son (Tyrone Goldsboro) arrived at Strickland's apartment to clean her carpet at around 8:20 to 8:25 a.m. Joiner testified: "When I walked into the room I seen a young lady laying on the couch with a blanket over her with a little bottle in her hand. So me and my son we picked the table up, I did the carpet and we left." He finished cleaning the carpet in about ten minutes.

At around 8:40 a.m., Joiner collected his equipment and "hollered to the lady we finished. And she didn't respond, so we locked the door and left." Both Joiner and Goldsboro testified that they did not touch the "lady that seem[ed] to be sleeping" on the couch.

A-3497-22

Another maintenance technician, Smith, testified that, on that July 10 morning, "defendant jotted out of the front door" muttering "gibberish" like "oh my god, oh my god" and "screaming, help, help, I need help, I need help." Smith responded to his pleas and entered Strickland's apartment to find her lying on the couch with the covers down below her waist. Noticing that her body was cold and dead, he pulled up the blanket "to give some respect."

The Experts

Dr. Gerald Feigin, the Camden County medical examiner, testified regarding Strickland's autopsy. Dr. Edward Chmara had performed the autopsy and wrote the initial report, and Dr. Feigin wrote two addenda to the report.

Dr. Feigin testified that Strickland's body was in rigor mortis, which takes about four to six hours to establish. Based on her injuries, Dr. Feigin concluded that Strickland's death was a homicide caused by "blunt neck trauma."[3]

Laura Tramontin, a forensic serologist for the New Jersey State Police, testified regarding the laboratory's biological-stain analysis. She explained that

---

[3]  Chmara's original report listed Strickland's cause of death as "manual strangulation." On cross-examination, Dr. Feigin explained that it was his practice to use the broader phrase "blunt neck trauma," but that manual strangulation was also "within reason."

a retired forensic analyst, Annette Estilow, authored the laboratory report in this case.

Because Estilow was Tramontin's "direct report," Tramontin allegedly "peer reviewed" Estilow's report for "technical correctness" as if she was doing the testing herself, and additionally signed the report. As we will discuss in more depth in Part II(A), infra, Tramontin did not perform the analysis and relied upon Estilow's report.

Tramontin testified that the serology lab received nine items: (1) Strickland's underwear; (2) fingernail clippings from Strickland's left hand; (3) fingernail clippings from Strickland's right hand; (4) Strickland's hair sample; (5) Strickland's FTA card;[4] (6) Strickland's vaginal swabs; (7) Strickland's buccal swab; (8) Strickland's anal swabs; and (9) the Colt 45 bottle. Six of these items were forwarded directly to the New Jersey State Police DNA unit for testing. The serology lab tested the remaining three items where biological stains were available.

Strickland's underwear tested presumptively positive for semen, and the sample was submitted to the DNA lab for further testing. In addition,

---

[4] Sometimes this evidence was incorrectly referred to as Strickland's "DNA" card.

Strickland's fingernail clippings and vaginal swabs tested presumptively positive for blood, and were similarly submitted to the DNA lab for further testing. The Colt 45 bottle and Strickland's FTA card were forwarded to the DNA lab without testing.

A forensic scientist of the New Jersey State Police, Christopher Szymkowiak, analyzed the DNA samples submitted by the forensic-serology lab. Szymkowiak concluded that Strickland was the "source of the major DNA profile" on the fingernail clippings, Colt 45 bottle, and vaginal swabs. Although Szymkowiak discovered male DNA on Strickland's fingernail clippings and sperm-cell vaginal swabs, he could not determine the source of that DNA without another reference sample.

Strickland's homicide turned into a "cold case" until 2015, when Detective Peter Longo of the CCPO revisited the file. He learned that defendant had since moved to Houston, Texas.

In August 2015, with assistance from the Houston Police Department, Longo obtained a buccal swab from defendant. With defendant's buccal swab, Szymkowiak was then able to conclude in his second report dated October 6, 2015, that defendant's DNA "matched" the profile on Strickland's fingernail clippings and sperm cell fraction of the vaginal swabs.

11

Szymkowiak also obtained DNA samples from Joiner, Goldsboro, and Brown, and, after analysis, excluded each of them as possible contributors to the DNA profiles contained in Strickland's left fingernail and vagina; however, he could not exclude them as contributors to the sample taken from Strickland's right fingernail. Szymkowiak testified, however, that the right fingernail data was "a very weak statistic" and "not very informative." He further explained that there is "the major and the minor profile. The major profile was matching [defendant]."

When Szymkowiak "compared the other reference materials for Raymond Brown and Tyrone Goldsboro and Tyrone Joiner, they all matched the minor Y profile" because "[t]he minor was so weak that when you compare a lot of people to it, a lot of people are going to match it."

The State also offered testimony regarding cell phone data. William Shute, an FBI cell-site analyst, testified that defendant's cell phone was "in the vicinity" of the crime scene until 12:24 a.m. on July 10, 2010. Between 12:24 a.m. and 3:47 a.m., defendant's phone showed no activity.

At 3:47 a.m., defendant's phone utilized cell sites "in the vicinity of the residence known to [Shute] as Malcolm Lackey's residence" in Gibbstown. Between 3:55 a.m. and 7:43 a.m., defendant's phone showed no activity. At 7:43

12

a.m., defendant's phone utilized cell sites located in the vicinity of Streater's residence in Camden. At 8:44 a.m., defendant's phone utilized cell sites located in the "area" of the Off Broadway Lounge. Finally, at 8:49 a.m., "the phone [was] back in usage in the vicinity of the crime scene 928 Jackson Street in Camden." Philip Fanara, an independent contractor for AT&T, testified that defendant changed his cellular phone device on July 11, 2010, the day after Strickland's murder was reported.

Testimony of "Other Crimes, Wrongs or Acts"

The State continued its case in chief by offering testimony attempting to establish defendant's alleged history of "possessiveness [and] jealousy" toward Strickland in the months prior to her murder.

Strickland's friend, Shamia Martin, who lived in the same apartment complex, testified about an August 2009 "knife incident." Martin explained that she was sitting in Strickland's living room when they heard a knock at the door. Strickland answered and defendant "barged his way in." Defendant heard Strickland talking with Martin and demanded to know who was in the house with her. Strickland responded, "[s]he's my friend" and defendant answered, "[b]ut why she's here, I told you I don't want anybody but you." Then, according to Martin, defendant reached for the knife in the kitchen sink. Strickland

reached "forward to control [it]," and they proceeded to "tussl[e] over it." Both defendant and Strickland were cut, but Strickland ultimately regained control of the knife and sent him out of the apartment. Martin suggested that they call the police, but Strickland declined.

Martin also testified regarding an encounter that she had personally had with defendant on the street on another occasion when defendant called out to her from his car. According to Martin, defendant got out of his car and approached her, stating that Strickland "don't need no friends. I'm the only friend she need[s]." Defendant returned to his car and called back to Martin, "you'll learn" and drove away. Martin believed that statement to be a threat. Lastly, Martin described another encounter when she called Strickland on her house phone, to which defendant answered and told Martin to "[s]top calling her" before he hung up.

The State offered testimony from Strickland's sister, Pamela[5] Strickland, who described an altercation at a bar—the "bar incident." In January 2010, Strickland and Pamela went to the Off Broadway Lounge where "a guy comes over and buys [them] a drink." Pamela did not know that defendant was also in the bar. Defendant approached the sisters and asked to talk to Strickland outside.

---

[5] We refer to Pamela by her first name for clarity; no disrespect is intended.

When they returned from their talk outside, defendant saw the guy who bought the sisters a drink and "sucker punched" him.

After the bar fight broke up, Pamela drove Strickland and defendant back to Strickland's apartment. Pamela described the ride home: "[Defendant is] in back of the [c]ar flipping out . . . hitting the seat. But you know, not hitting her."

Strickland's niece, Alexis Williams, babysat Strickland's children every day after school through the end of June 2010 and had also planned to babysit for her aunt on the weekend of July 4, 2010. Williams testified that her now-deceased mother instructed her not to babysit for Strickland if defendant was around.

According to Williams, one time she called Strickland's home phone, and defendant answered. Williams confirmed it was defendant and hung up. Thereafter, Williams received six phone calls from defendant, which her mother instructed her not to answer. Williams described voicemails left on her phone of "somebody breathing." Williams and her uncle later called defendant to confront him about the phone calls, after which the calls ended.

Cotton, Strickland's friend and neighbor, testified that defendant called Strickland a "bitch" and warned Cotton to "watch [her] back." Cotton further

15

recalled that Strickland and defendant "broke up or whatever. She wanted him out, whatever was going on."

The apartment property manager, Greta Culbreath, testified that a month before the murder, Strickland requested to have her locks changed because defendant "kept coming in" her apartment.

Melanie Gray, Strickland's sister, testified that once defendant called her to tell her that "he wasn't the bad guy that people were making him out to be. That [Strickland] does things to[o] and he just wanted me [to] know that."

The State also offered testimony about a March 2020 "choking incident" between defendant and Strickland. Officer Tracy Hall of the CCPO testified that on March 27, 2010, she responded to a 9-1-1 call placed by Strickland. Upon arrival at the residence, Hall observed that Strickland sounded "raspy, kind of hoarse" and "had marks around her neck, indicative [of] being strangled."

Hall testified that Strickland told her that her boyfriend "choked her." Strickland explained the precipitating events to Hall as follows: "defendant came in wanting money from [Strickland]. When she refused to give him money[,] he began to choke her violently. And he began to say that he was going to bust her in her face and . . . he was going to get her." He then removed money from her purse and left.

16

On March 31, 2010, Investigator Gregory Berry of the CCPO conducted an interview with Strickland in connection with his investigation of the "choking incident," which was played at trial for the jury.[6]  In that interview, Strickland told Berry that she and defendant had argued that morning before work. Strickland came home from work, and defendant went out to drink at Off Broadway around 2:00 p.m.

As relayed by Berry, at around 1:00 a.m., defendant returned to Strickland's apartment and accused her of "messing with the maintenance men down here."  Strickland asked him to go home and sleep it off, but "he just kept coming at" her.  Strickland tried to "get up to the steps . . . to call the cops," but defendant blocked her.  Then, "[h]e grabbed [her] around [her] neck," and Strickland fell on the floor.  She called the police soon after this had occurred.

Later that day after the interview had been conducted, Strickland called Lieutenant Berry and asked him "to explain like the process, like, you know[,] what's going to happen from that point on."  Berry explained that "defendant

---

[6]  An audio recording of this interview was made, and a redacted version was played for the jury after the trial court previously ruled that "Strickland's March 31, 2010 statement to investigator Berry [wa]s admissible substantively pursuant to [N.J.R.E.] 804(b)(9)."  Redactions were agreed upon by counsel based on the court's ruling.  We have listened to the recording as part of our review on appeal.

called [Strickland] that day to ask her what was going on with the case," and Berry gave Strickland information regarding "the victim witness advocacy unit" given his concern over the fact that defendant lived next door to her.

On May 12, 2010, the day of defendant's pre-indictment conference for the "choking incident," Berry received "a lot of phone calls and hang ups back-to-back." Eventually, Strickland spoke to Berry and admitted that it was defendant calling and hanging up and "that he was sitting right next to her." Berry asked Strickland if she was "okay," and Strickland "said yes and immediately hung up."

According to Berry, a "short time later," Strickland called Berry again, basically "whispering," because defendant "was in the room and . . . wouldn't leave." Berry asked Strickland if she needed police assistance, but "she said no, because he was just tripping because he thought the case would get dismissed." She stated to Berry, "I'm not really scared of him, it's just that he lives right next door so I don't know how he's going to act."

A-3497-22

B.

The Indictment, Pretrial Events, and Trial

In June 2016, a Camden County grand jury indicted defendant and charged him with first-degree murder "by strangling [Strickland]," N.J.S.A. 2C:11-3(a)(1) and/or N.J.S.A. 2C:11-3(a)(2).

Various pretrial motions and rulings ensued. In September 2017, defendant moved to suppress evidence police obtained through the search of Strickland's apartment, which the court denied three months later. Defendant also moved to suppress his police statement under <u>Miranda</u>, which the court denied in February 2018.

In December 2018, defendant filed a speedy trial motion on his own behalf, which was denied.

Meanwhile, the State moved to admit evidence of defendant's prior acts under N.J.R.E. 404(b) and Strickland's statement to the police pursuant to the forfeiture-by-wrongdoing hearsay exception, N.J.R.E. 804(b)(9).

In an oral decision issued on April 16, 2018, and order dated May 3, 2018, the court granted in part and denied in part the State's motion. Specifically, the court permitted "prior bad acts" testimony under N.J.R.E. 404(b) from various witnesses to describe the August 2009 "knife incident," the January 2010 "bar

19

incident," and the March 2010 "choking incident." In addition, the court ruled that Strickland's prior testimonial statement made in connection with a prior and pending domestic violence "choking incident" was admissible under N.J.R.E. 804(b)(9) and under N.J.R.E. 404(b) as a prior bad act. The court further held that "[t]he defense will not be permitted to elicit testimony or bring out testimony that the victim was charged in [the "knife incident"] case," finding such testimony about that incident to be inadmissible as hearsay and not relevant.

Thereafter, defendant moved to dismiss the indictment, arguing the State failed to make a prima facie case, and had failed to present exculpatory evidence to the grand jury. The court denied the motion.

In December 2018, a Camden County grand jury returned a superseding indictment against defendant, again charging him with first-degree murder (count one), but removing the indictment's reference to strangulation.

Defendant moved to suppress evidence of his buccal swabs, which was denied by the court. He also made a second motion to dismiss the case for lack of a speedy trial, which was again denied.

Defendant's seventeen-day jury trial began on January 4, 2023, and concluded on February 15, 2023. The State presented numerous witnesses and

other evidence we have already described. Because there were no eyewitnesses to the homicide and defendant had not made self-incriminating statements, the State's case, by necessity, was largely circumstantial.

Defendant did not testify on his own behalf, but he did call several witnesses. The witnesses included the aforementioned carpet cleaner Joyner, his son Goldsboro, and CCPO Detective Longo. Defendant also called Sergeant John Waida of the Camden County Police Department, the responding officer for the knife incident. Waida testified that he interviewed both defendant and Strickland at the hospital. According to Waida, Strickland told him that defendant came to her house, she let him in, they exchanged words, she grabbed a kitchen knife to force him to leave her apartment, and during a tussle over the knife, her left thumb was accidentally cut.

In addition, defendant presented testimony by CCPO Detective Anthony Pagan, who was the initial lead homicide detective until he was deployed for military duty in 2011. The defense attempted to use Pagan to show that other witnesses were untruthful about various facets of their testimony. Defendant also called a loss prevention advisor from PNC Bank, in a failed attempt to authenticate an alleged bank record.

21

Before summations, defendant moved for judgment of acquittal, which the court denied.

On February 15, 2023, the jury returned a guilty verdict on the single count charged, first-degree murder.

On May 19, 2023, the court denied defendant's motion for a new trial and proceeded to sentencing. As we have noted above, on count one, first-degree murder, the court sentenced defendant to sixty years subject to NERA, N.J.S.A. 2C:43-7.2.

This direct appeal ensued.

C.

Before us, defendant makes the following points in his counseled brief:

POINT I

THE COURT VIOLATED SIMON'S RIGHT TO CONFRONTATION BY ALLOWING THE STATE TO ADMIT STRICKLAND'S PRIOR TESTIMONIAL STATEMENT TO POLICE WHERE THE STATE DID NOT ESTABLISH AND THE TRIAL COURT DID NOT FIND THAT SIMON ACTED WITH THE PURPOSE OF PREVENTING STRICKLAND FROM TESTIFYING AGAINST HIM.

POINT II

THE COURT VIOLATED SIMON'S RIGHT TO CONFRONTATION BY ALLOWING THE STATE TO PRESENT EXPERT TESTIMONY THAT

SUMMARIZED THE FINDINGS OF A NON-TESTIFYING ANALYST.

POINT III

THE TRIAL COURT ERRONEOUSLY ALLOWED THE INTRODUCTION OF EXTENSIVE PREJUDICIAL TESTIMONY ABOUT SIMON'S PRIOR BAD ACTS THAT SERVED ONLY TO SUGGEST THAT SIMON ACTED IN CONFORMITY WITH A PROPENSITY FOR VIOLENCE.

POINT IV

THE TRIAL COURT DEPRIVED SIMON OF THE RIGHT TO PRESENT A COMPLETE DEFENSE BY REFUSING TO ALLOW HIM TO PRESENT RELEVANT EVIDENCE THAT STRICKLAND WAS CRIMINALLY CHARGED FOR AN ALTERCATION WITH SIMON THAT THE STATE ELICITED TESTIMONY ABOUT DURING TRIAL.

POINT V

THE FAILURE TO CHARGE THE JURY ON THIRD-PARTY GUILT DENIED SIMON DUE PROCESS AND A FAIR TRIAL.  (Not raised below).

POINT VI

SIMON WAS DEPRIVED OF A FAIR TRIAL BY THE STATE'S PERVASIVE MISCONDUCT DURING SUMMATION.  (Not raised below).

POINT VII

THE CUMULATIVE EFFECT OF THE LEGAL ERRORS DENIED SIMON A FAIR TRIAL.

Defendant also presents the following, somewhat overlapping, arguments in his uncounseled supplemental brief:

SUPPLEMENTAL POINT I

MR. TIMOTHY SIMON IS ENTITLED TO A JUDGMENT OF ACQUITTAL AND HIS CONVICTION VACATED AND INDICTMENT DISMISSED WITH PREJUDICE, AS THE JURY VERDICT WAS BEYOND THE WEIGHT OF THE EVIDENCE AND BASED UPON SPECULATION AND CONJECTURE FORBIDDEN BY OUR SUPREME COURT IN STATE V. LODZINSKI, INFRA; U.S. CONST., AMENDS. IV, V, VI, VIII, XIV; N.J. CONST., ART. I, ¶¶ 1, 8, 9, 10, 12.

SUPPLEMENTAL POINT II

THE COMPLAINT WARRANT WAS FALSIFIED AND BACKDATED ON A WARRANT FORM THAT WAS REVISED AND CREATED FOR USE ON "1/1/2017," WHILE MR. SIMON WAS ARRESTED ON "1/27/2016," A YEAR BEFORE THIS FORM WAS CREATED, AND IT DOES NOT HAVE THE REQUIRED SIGNATURE OF A JUDICIAL OFFICER, THUS MAKING HIS ARREST AND DETENTION ILLEGAL, IN VIOLATION OF U.S. CONST., AMENDS. IV, V, VI, VIII, AND XIV; N.J. CONST., ART. I, ¶¶ 1, 8, 9, 10, 12.

SUPPLEMENTAL POINT III

MR. SIMON'S RIGHTS TO A SPEEDY TRIAL WHERE VIOLATED WHERE THE TRIAL COURT DENIED HIS MOTIONS FOR A SPEEDY TRIAL, THUS CAUSING HIM TO AWAIT TRIAL IN THE COUNTY JAIL FOR SEVEN YEARS, VIOLATING

24

U.S. CONST., AMENDS. IV, V, VI, VIII, XIV; N.J. CONST., ART. I, ¶¶ 1, 8, 9, 10, 12.

SUPPLEMMENTAL POINT IV

THE TRIAL COURT VIOLATED MR. SIMON'S CONSTITUTIONAL RIGHTS TO A PUBLIC TRIAL BY BARRING HIS MOTHER FROM THE COURTROOM FOR UNJUSTIFIED REASONS, IN VIOLATION OF U.S. CONST., AMENDS. I, IV, V, VI, VIII, XIV; N.J. CONST., ART. 1, ¶¶ 1, 8, 9, 10, 12.

SUPPLEMENTAL POINT V

MR. SIMON'S CONVICTION MUST BE VACATED AND INDICTMENT DISMISSED WITH PREJUDICE DUE TO THE PROSECUTOR FAILING TO PRESENT EXCULPATORY INFORMATION TO THE GRAND JURY, IN VIOLATION OF STATE V. HOGAN, 144 N.J. 216 (1996); U.S. CONST., AMENDS. IV, V, VI, VIII, XIV; N.J. CONST., ART. I, ¶¶ 1, 8, 9, 10, 12.

SUPPLEMENTAL POINT VI

THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR IN FAILING TO CHARGE THE JURY ON THIRD-PARTY GUILT WHEN EVIDENCE EXISTED OF ANOTHER MALE'S DNA ON THE VICTIM'S BODY, INTER ALIA, WHICH DENIED MR. SIMON HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL, VIOLATING U.S. CONST., AMENDS. IV, V, VI, VIII, XIV; N.J. CONST., ART. I, ¶¶ 1, 8, 9, 10, 12.

SUPPLEMENTAL POINT VII

THE CUMULATIVE EFFECT OF TRIAL ERRORS
DENIED MR. SIMON DUE PROCESS AND A FAIR
TRIAL, VIOLATING U.S. CONST., AMENDS. I, IV,
V, VI, VIII, XIV; N.J. CONST., ART. 1, ¶¶ 1, 8, 9, 10,
12.

II.

We address the main arguments in the sequence that defendant's appellate counsel chose to present them before us at oral argument.

A.
(Serologist Findings/Confrontation)

As his primary point argued before us, defendant contended the trial court erred in permitting the State to present expert testimony from a supervisor (Tramontin) who summarized the findings of a non-testifying forensic analyst (Estilow) in violation of his right to confrontation as guaranteed by the Sixth Amendment of both the United States Constitution and the New Jersey State Constitution. He claims that "[a]side from the DNA evidence, the State's case against [defendant] was entirely circumstantial," emphasizing how critical this forensic testimony was in contributing to the jury's guilty verdict. He contends the serology evidence was improper "surrogate" expert opinion of a hearsay declarant admitted in violation of the Confrontation Clause and Smith v. Arizona, 602 U.S. 779 (2024).

26

The State responds that defendant's confrontation rights were not violated because the serologist's testimony was not hearsay because it was not "surrogate testimony," and even if it was, defendant had the opportunity to effectively cross-examine Tramontin who conducted an independent review of Estilow's work. Finally, the State argues that any error is harmless because "defendant overstates the significance of Tramontin's testimony" because "another expert [(Szymkowiak)] linked defendant to the DNA found on the victim."

We preface our discussion of this issue with a more detailed summary of the pertinent facts. At trial, the State called Tramontin, a forensic analyst supervisor at the New Jersey State Police, who was accepted as an expert in forensic biological stain analysis. Tramontin testified that through her role as a supervisor, she conducted both a "peer review" and an "administrative review" of Estilow's criminalistics laboratory report. She testified that the underwear tested positive for seminal material, the fingernail clippings tested positive for blood, and the vaginal swabs tested positive for spermatozoa. She explained that once the biological stain analysis was completed, the items were either returned to the evidence vault or forwarded for DNA testing. Tramontin further testified that procedure was followed "correctly and accurately" in this case.

Defendant objected to Tramontin's testimony, arguing that "the supervisor could not testify to the findings made by a non-testifying analyst under the Confrontation Clause." The court overruled the objection for indecipherable reasons due to poor transcript quality.

Certain constitutional principles guide our review of the trial court's ruling. "The Sixth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, provides an accused the right 'to be confronted with the witnesses against him.' The New Jersey Constitution provides a cognate guarantee to an accused in a criminal trial." State v. Roach, 219 N.J. 58, 74 (2014) (citing N.J. Const. art. I, ¶ 10). The Confrontation Clause "prohibit[s] the use of out-of-court testimonial hearsay, untested by cross-examination, as a substitute for in-court testimony." State ex rel. J.A., 195 N.J. 324, 342 (2008) (emphasis in original). "The Clause's prohibition 'applies only to testimonial hearsay[.]'" Smith, 602 U.S. at 784 (quoting Davis v. Washington, 547 U.S. 813, 823 (2006)).

It is indisputable that "the Confrontation Clause applies to forensic reports." Smith, 602 U.S. at 785 (citing Melendez-Diaz v. Massachusetts, 557 U.S. 305, 312 (2009)). In that forensic context, the United States Supreme Court made clear over decade ago in Bullcoming v. New Mexico, 564 U.S. 647, 651-

52 (2011), that "a State could not introduce one lab analyst's written findings through the testimony of another." Smith, 602 U.S. at 786. The Court held in Bullcoming that the admission of such "surrogate expert" testimony violates the Confrontation Clause. Ibid. (quoting Bullcoming, 564 U.S. at 661).

In State v. Michaels, 219 N.J. 1, 45 (2014), the New Jersey Supreme Court examined the problematic nature of admitting "surrogate testimony." In Michaels, the Court reviewed testimony about laboratory results of tests performed on a blood sample drawn from the defendant, which revealed the presence of cocaine and other substances. Id. at 5. At trial, the State introduced the testimony of an expert who was an assistant supervisor and toxicology technical leader from a laboratory that had performed testing on the blood sample and issued a report certifying the test results. Ibid. He was responsible for supervising fourteen analysts and technicians who had performed the testing procedures "for their adherence to the laboratory's policies and protocols for the testing procedures," and for reviewing the results of these procedures to his satisfaction that "the test data accurately identified and quantified the substances found in defendant's blood," signing and certifying the laboratory results set forth in the report Id. at 5-6. Over the defendant's objection, the trial court

admitted the report without the testimony of the fourteen analysts and technicians that the expert supervised. Id. at 6.

Upon reviewing the evolution of Confrontation Clause doctrine in recent Supreme Court case law, Michaels held that a supervising expert was permitted to testify as to the test results because he had used them to form his own independent opinions and was not simply conveying the opinion of others. Id. at 43.

> [W]e join the many courts that have concluded that a defendant's confrontation rights are not violated if a forensic report is admitted at trial and only the supervisor/reviewer testifies and is available for cross-examination, when the supervisor is knowledgeable about the testing process, reviews scientific testing data produced, concludes that the data indicates the presence of drugs, and prepares, certifies, and signs a report setting forth the results of the testing.
>
> [Id. at 6 (emphasis added).]

Decided as a companion case with Michaels, Roach, 219 N.J. at 60, concerned a testifying analyst who opined that the defendant's DNA profile obtained from a buccal swab matched a DNA profile developed by another analyst using samples of the perpetrator collected immediately following the crime. The testifying expert "explained that she engaged in that independent review to satisfy herself that" the non-testifying expert's analysis was correct.

Ibid. Citing Michaels, the Court held in Roach that the defendant's confrontation rights were not violated, explaining:

> In the context of testing for the purpose of establishing DNA profiles for use in an expert's comparison of DNA samples, we conclude that a defendant's federal and state confrontation rights are satisfied so long as the testifying witness is qualified to perform, and did in fact perform, an independent review of testing data and processes, rather than merely read from or vouch for another analyst's report or conclusions.
>
> [Id. at 61 (emphasis added).]

The Court explained that, in Michaels, "[o]ur holding did not rest on any obligation of the supervisor to have observed the testing, but it did rely on the supervisor's knowledge of the laboratory's testing procedures and protocols generally and his training and knowledge of the particular testing involved." Id. at 78.

However, the Roach Court cautioned that if the testifying analyst "merely parrot[ed] the findings of another" or just "read from another analyst's report," a confrontation clause problem would exist. Id. at 79, 82. The Court held, "we do not share the view that an independent reviewer cannot verify a machine-generated testing process and results, satisfy herself of the reliability of the results, and reach a conclusion based on the testimonial facts she has made her own through that independent review." Id. at 82 (emphasis added).

31

Two years ago, the United States Supreme Court revisited the Confrontation Clause issue in Smith, 602 U.S. at 779, a case that defendant argues ended the so-called Michaels "workaround."  In Smith, the United States Supreme Court instructed that when an expert witness relies on testing conducted by a non-testifying person to form an opinion, the expert necessarily relies on the truth of the underlying test results to form an opinion and is therefore hearsay.  Id. at 794-96.  The Court reasoned that "[i]f an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts.  How could it be otherwise?"  Id. at 795.  Thus, every "testimonial lab report" faces Confrontation Clause scrutiny.  Id. at 799.

The Court summarized its holding in Smith as follows:

> A State may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her.  Neither may the State introduce those statements through a surrogate analyst who did not participate in their creation.  And nothing changes if the surrogate—as in this case—presents the out-of-court statements as the basis for his expert opinion.  Those statements, as we have explained, come into evidence for their truth—because only if true can they provide a reason to credit the substitute expert.  So a defendant has the right to cross-examine the person who made them.

32

[Id. at 802-03 (citations omitted).]

More recently, this court considered the ramifications of Smith in State v. K.W., 483 N.J. Super. 58, 64 (App. Div. 2025). The defendant in K.W. was convicted of second-degree sexual assault and fourth-degree criminal sexual contact of his adult niece, J.G., at a party in 2019. Ibid. The State's toxicology expert who conducted J.G.'s urine and blood testing and wrote the report was unavailable to testify at trial and therefore replaced by her supervisor, Verdino. Id. at 70.

Verdino testified at the Rule 104 hearing and later before a jury, revealing that the toxicology tests indicated that J.G. had a blood alcohol content of 0.059 and ketamine in her system. Id. at 70-72. Verdino testified that she "peer reviewed" the case as the "technical reviewer," including approximately one hundred pages of notes. Id. at 71. The defendant did not object. Ibid.

On appeal, for the first time, the defendant in K.W. argued that his right to confront witnesses was violated when the supervising toxicologist testified about another analyst's test results in violation of Smith. Id. at 80. Importantly, the defendant had not objected at trial to the substitute expert's testimony on Confrontation Clause grounds and "strategically" used the toxicology results in his defense. Ibid.

33

Given these circumstances in K.W., we concluded that Verdino's testimony violated Michaels and the defendant's right to confrontation because Verdino "repeated" and "parroted" the testing expert's findings and conclusions, labeling it "testimonial hearsay." Id. at 84. However, because the defendant had not objected to Verdino's testimony on that basis, we ruled that he had waived his right to confrontation under State v. Williams, 219 N.J. 89, 98 (2014) ("The right of confrontation, like other constitutional rights, may be waived by the accused."). Id. at 85. We noted that the defendant had "made the tactical decision to use Verdino's testimony in support of his defense." Ibid. Hence, there was no constitutional violation.

Although we did not need to reach the issue in light of that waiver, we observed in K.W. that the precedent of "Michaels remains sound after Smith" because when machine-generated data is interpreted independently by a testifying expert, it does not violate the Confrontation Clause. Id. at 87. We also noted that our Supreme Court in Roach, 219 N.J. at 81, had stressed the importance of the distinction between the raw data itself and the opinions generated from interpreting that raw data: "it was the 'independent interpretation of the machine-generated data [that] converted raw data into unmistakably testimonial material subject to the Confrontation Clause.' 'The subjective

A-3497-22

analysis involved in creating the DNA profile from the machine-generated graphs marks a clear turning point, at which the raw data becomes testimonial material[.]'" Id. at 88 (quoting Roach. 219 N.J. at 81) (alteration in original)

Summarizing these principles, we stated in K.W.:

> [W]e conclude machine-generated data is not the equivalent of a testimonial statement. Therefore, when a testifying expert reaches an independent opinion based on machine-generated data created by another person, a defendant's right to confrontation is not violated. Accordingly, if an expert testifies to independent opinions reached based on machine-generated data as permitted by Michaels, there would not be a Confrontation Clause violation under the rule established in Smith.
>
> [Id. at 88 (emphasis added).]

Applying these concepts here, we reach several conclusions. First, it is readily apparent that the serologist's findings were "testimonial." The State Police laboratory's primary, if not complete, purpose is to assist law enforcement in ascertaining the identity of criminal perpetrators. It is not a research facility or an academic institution. The testing was not a quality control exercise. See Smith, 602 U.S. at 802.

Second, unlike in K.W., the serologist's findings were not merely a recitation of "machine-generated" data. The findings conveyed Estilow's

professional conclusions about which items contained blood stains, after she analyzed the raw data.

Third, Tramontin did not observe or directly participate in Estilow's testing of the samples. Although she signed Estilow's report as her supervisor, Tramontin did not conduct an "independent review" of raw data. See Roach, 219 N.J. at 61. Tramontin relied upon the content and accuracy of her subordinate's work. As such, she functioned as a "surrogate witness" under the case law nomenclature.

But we now make an important fourth point, focusing on whether the admission of Estilow's findings without defendant's opportunity to cross-examine her was consequential in the context of this case. It was not. Stated differently, the serology findings were predominantly offered for chain-of-custody and background reasons and not for their substantive truth.

As Tramontin explained, the serology lab performs screening to determine if any biological stains are available on evidence collected. Some pieces of evidence go straight to DNA testing without screening at the serology lab, such as fingerprints and bottles. Others are submitted for biological stain analysis. Although in this case the lab received nine items, only some underwent biological stain analysis (and were "screened"); the balance was forwarded to

36

the DNA lab directly for testing. The "screened" items were also forwarded to the DNA lab for testing when the stain analysis returned positive for blood or semen.

Tramontin's testimony regarding lab procedures and chain of custody are not hearsay because they are based on personal knowledge and experience. Smith, 602 U.S. at 799 (acknowledging that the supervising expert "could testify from personal knowledge about how that lab typically functioned—the standards, practices, and procedures it used to test seized substances, as well as the way it maintained chains of custody"). This type of testimony presented by Tramontin was admissible and not hearsay under Smith.

Estilow's lab report was markedly different from forensic testimony that identifies the defendant. The conclusions reached in Estilow's report did not identify defendant. The serology testing was simply a screening process designed to identify what evidence contained biological fluid to be submitted for further DNA testing. The actual incriminating "match" was instead attained by the State's testifying DNA expert.

Even if we were to regard the serology findings, as used in this case, as inadmissible, any error in admitting them is harmless beyond a reasonable doubt. Tremontin's testimony did not have a manifestly consequential impact

A-3497-22

leading to defendant's conviction, as other competent expert testimony verified the DNA results in any event. See State v. Ingram, 196 N.J. 23, 49 (2008) (delineating harmless error standards).

As the State rightly points out, "[h]ad there been no serological screening and all samples were forwarded directly to the DNA lab, the same evidence would have been admissible." Any comparison between DNA results from different individuals that the State presented to the jury were inevitable without screening, and admissible through a different witness who was, indeed, subjected to cross-examination.

We therefore reject defendant's argument that he is entitled to a new trial based on the admission of the serologist's findings.

B.
(Forfeiture-By-Wrongdoing Hearsay Exception)

We next consider defendant's argument that the trial court erred in allowing the State to present Strickland's police interview under the forfeiture-by-wrongdoing hearsay exception, N.J.R.E. 804(b)(9). We detect no such error.

As a starting point of this issue, we recognize that the State does not dispute that Strickland's recorded statement was offered for its truth and constitutes hearsay. The statement detailed how defendant attempted to strangle her on a previous occasion. For reasons we will discuss in Part II(C), infra, the

38

evidence of that prior bad act was used by the State under N.J.R.E. 404(b) to help establish defendant's motive and intent to commit the homicide. Apart from the forfeiture exception under N.J.R.E. 804(b)(9), the State relies on no other hearsay exception.

Because this issue involves the court's evidentiary application of a hearsay exception, we review the court's decision with considerable deference. State v. Garcia, 245 N.J. 412, 430 (2021) (citing State v. Nantambu, 221 N.J. 412, 402 (2015)). An appellate court "will not substitute [its] judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting State v. Medina, 242 N.J, 397, 412 (2020)).

The terms of the forfeiture exception have been made clear under case law and the text of the rule itself.[7] The codified exception originated with the United States Supreme Court's seminal decision in Giles v. California, 554 U.S. 353, 367 (2008), in which the Court addressed how evidence of domestic violence

---

[7] N.J.R.E. 804(b)(9) renders hearsay by an unavailable declarant admissible if that hearsay is: "a statement offered against a party who has engaged, directly or indirectly, in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." The New Jersey provision parallels its federal counterpart, Federal Rule of Evidence 804(b)(6), which provides that "[a] statement offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result" is "not excluded by the rule against hearsay."

could demonstrate a defendant's intent to render a witness unavailable. In Giles, the defendant shot his girlfriend six times after others reported hearing the couple argue, but no one witnessed her murder. Id. at 356. Prosecutors moved at the murder trial to introduce a statement by Giles's deceased girlfriend, which she had made after a domestic violence incident that occurred three weeks earlier. Id. at 356. At that time, she claimed that Giles had accused her of having an affair, a physical fight broke out, Giles began choking her, and he threatened to kill her with a knife. Id. at 357.

The trial court in Giles admitted these testimonial statements "under a provision of California law that permits admission of out-of-court statements describing the infliction or threat of physical injury on a declarant when the declarant is unavailable to testify at trial and the prior statements are deemed trustworthy." Id. at 357.

The Supreme Court majority in Giles, although electing not to uphold California's specific rule, did recognize forfeiture as a "founding-era exception to the confrontation right." Id. at 358. The Court held that "the exception applied only when the defendant engaged in conduct designed to prevent the witness from testifying." Id. at 359 (emphasis in original). "This phrase requires

A-3497-22

that the defendant have schemed to bring about the absence from trial that he 'contrived.'" Id. at 360. As the Court observed:

> The common-law forfeiture rule was aimed at removing the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them— in other words, it is grounded in "the ability of courts to protect the integrity of their proceedings." The boundaries of the doctrine seem to us intelligently fixed so as to avoid a principle repugnant to our constitutional system of trial by jury: that those murder defendants whom the judge considers guilty (after less than a full trial, mind you, and of course before the jury has pronounced guilt) should be deprived of fair-trial rights, lest they benefit from their judge-determined wrong.
>
> [Id. at 374 (internal citations and footnote omitted).]

Later, in 1997, the Court approved the evidentiary exception, codifying the common law forfeiture doctrine. Id. at 367.

Our state followed the lead of Giles in endorsing a forfeiture-by-wrongdoing hearsay exception in State v. Byrd, 198 N.J. 319, 357 (2009). In Byrd, the New Jersey Supreme Court declared that "the time has come for New Jersey to follow the course taken by many other jurisdictions and codify a forfeiture-by-wrongdoing exception to the hearsay rule." Id. at 324. The Court announced that such a rule will advance "three important policy objectives": "First, it will ensure that a criminal defendant will not profit from making a

witness unavailable to testify. Second, it will provide a powerful disincentive against witness intimidation. Last, it will further one of the primary goals of every trial—the search for truth." Id. at 324-25. The Court summarized, "the forfeiture-by-wrongdoing doctrine is grounded in common sense, supported by public policy, and does not run afoul of the federal Confrontation Clause." Id. at 340.

In so holding, Byrd set forth guidelines for admissibility of a declarant's out-of-court statements under the forfeiture-by-wrongdoing exception. Id. at 350. First, "as soon as reasonably practicable," "[t]he State must reveal the identity of the witness and the particulars of the statement that will be offered into evidence." Ibid. "Next, the trial court must conduct an N.J.R.E. 104(a) hearing, outside the presence of the jury, to determine whether the witness's out-of-court statement should be admitted into evidence because the defendant engaged in wrongful conduct, making the witness unavailable." Ibid. A witness is deemed unavailable when the "witness continues to refuse to testify after the threat of contempt," "the witness cannot be located, has been rendered unable to testify because of the infliction of physical or psychological injuries, or has been killed as a result of the wrongful conduct of the defendant." Id. at 351-52. Importantly here, "[a]t the hearing, the State will bear the burden of proving by

A-3497-22

a preponderance of the evidence that defendant engaged, directly or indirectly, in wrongdoing that was intended to, and did, procure the witness's unavailability." Id. at 352.

Finally, "the court must determine that the statement bears some indicia of reliability" using the "methodology that we apply in the case of recanting witnesses" as detailed in State v. Gross, 121 N.J. 18, 29 (1991) and N.J.R.E. 803(a)(1). Id. at 352-53. A prior statement "is admissible 'as substantive evidence provided its reliability has been established by a preponderance of the evidence in light of all surrounding relevant circumstances'" if the prior statement:

> (A) is contained in a sound recording or in a writing made or signed by the witness in circumstances establishing its reliability or (B) was given under oath subject to the penalty of perjury at a trial or other judicial, quasi-judicial, legislative, administrative or grand jury proceeding, or in a deposition[.]
>
> [Ibid. (quoting N.J.R.E. 803(a)(1); Gross, 121 N.J. at 29).]

More recently, we addressed in State v. Lebron, __ N.J. Super. ___ (App. Div. 2026) (slip op. at 2), the specific issue of whether the intent of a defendant to make a declarant unavailable to testify at a future proceeding needs to be the defendant's sole intent, in order to satisfy the forfeiture-by-wrongdoing

exception. We clarified in <u>Lebron</u> that the intent does not have to be singular, and that the defendant can have mixed motives. <u>Id.</u> at \_\_ (slip op. at 21).

In the present case, the trial court appropriately conducted a Rule 104 hearing to evaluate whether Strickland's police interview would be admissible under forfeiture-by-wrongdoing exception. Among other things, the court found that:

> based upon the testimony provided with the numerous phone calls made when the matter wasn't dismissed at PIC [("pre-indictment conference")], and that . . . the defendant kept calling the Prosecutor's Office and the prosecutor investigator kept getting phone calls and finally Ms. Strickland when she did call was whispering, tells me that . . . the defendant caused her unavailability.

The record contains substantial indicia that not only did defendant, cause Strickland's unavailability to testify against him about the prior incident by his violent lethal conduct on the night in question, but he deliberately intended to prevent her from doing so through that conduct. Defendant's purposeful state of mind in this regard to stifle Strickland was exemplified by several items of evidence.

For one thing, there was considerable evidence of "earlier abuse, or threats of abuse" as specifically identified by the <u>Giles</u> Court as "highly relevant to the inquiry." <u>Giles</u>, 554 U.S. at 377. In this regard, Strickland's sister Gray testified

44

that defendant's jealous behavior prompted her—presciently—to warn Strickland "that mother fucker's going to kill you." In addition, Strickland's friend Martin testified that defendant was abusive toward Strickland, that he would "chok[e] her and hit[] her." Martin elaborated that defendant was controlling and would grab Strickland by the neck "whenever somebody called her, she wanted to go somewhere, or if anybody waved at her or anything." Martin also witnessed the "knife incident," testifying that during an argument, defendant lunged at Strickland with a knife and cut her hands and arms.

Further evidence of defendant's jealousy and possessiveness demonstrated that it led to more abuse. Martin testified that one day, defendant stopped his car next to her and warned her to stop talking to Strickland because she does not "need any friends." Strickland's supervisor, Kearney, testified that defendant called her at work too often, and when she expressed concern about this to Strickland, Strickland called defendant "just a little bit possessive." Longo testified that Strickland filed "a report" with the police describing defendant's harassing calls. Strickland's other sister described the relationship between Strickland and defendant as "very toxic" and recounted the "bar incident" that sent defendant into a violent and jealous rage.

Defendant also repeatedly exhibited an obsessive concern about the pending strangulation case, in which Strickland would be presumably called by the State to testify.

Considering these proofs and the totality of the circumstances, the record contains ample support for the trial court's determination that Strickland's police interview was admissible under N.J.R.E. 804(b)(9). To be sure, defendant did not act solely to prevent Strickland from testifying as the jury found defendant also had the intent to end Strickland's life. But, as we held in Lebron, such multiple motives do not render the hearsay exception inapplicable.

We are cognizant that the trial court did not make an explicit finding that Strickland's police interview bore "indicia of reliability." But it is indisputable that the interview comported with N.J.R.E. 803(a)(1)(A) as being contained in a sound recording. It is also readily apparent that the circumstances and tenor of the recorded statement were formal and factual. There is nothing in the record to suggest that Strickland was coerced, under the influence of drugs or alcohol, or did not understand the purposes of the interview. We discern no practical reason to remand this issue to have the trial court make a finding that is justified and discernable from the existing record.

A-3497-22

Hence, we affirm the trial court's determination to admit the statement under Rule 804(b)(9).

## C.
### (Rule 404(b) Evidence and Limiting Instruction Issues)

As his third primary point, defendant argues the trial court erred in admitting the Rule 404(b) evidence respectively concerning the three incidents of alleged prior bad acts (the knife incident, the bar incident, and the choking incident). As we noted above, the State proffered that evidence as proofs of defendant's motive and intent to kill Strickland, conditioned on limiting instructions the trial court issued to the jury.

Defendant contends the limiting instructions were untimely and flawed. He also argues that the trial court unfairly prevented his counsel from attempting to impeach Strickland's credibility concerning the knife incident because she herself had been charged with offenses and was thus biased to curry favor with the State during her interview. Based on these arguments, defendant contends that he is entitled to a new trial as a result of such alleged "harmful errors."

N.J.R.E. 404(b) provides as follows:

(b) Other Crimes, Wrongs or Acts.

(1) Prohibited Uses. Except as otherwise provided by Rule 608(b), evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order

47

> to show that on a particular occasion the person acted in conformity with such disposition.
>
> (2) Permitted Uses. This evidence <u>may</u> be admitted for <u>other purposes</u>, such as proof of <u>motive</u>, opportunity, <u>intent</u>, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute.
>
> [N.J.R.E. 404(b) (emphasis added).]

Very recently in State v. Seddens, ___ N.J. Super. ___ (App. Div. 2026) we delineated at length the contours and history of N.J.R.E. 404(b) and the applicable legal principles governing the use of that evidence rule. As we noted in Seddens, the rule has been interpreted and applied to entail a balancing of the "anti-propensity" policies that support the exclusion of proof of a defendants' prior bad acts against the probative value of the non-propensity uses of that evidence specified by the State. Id. at ___ (slip op. at 30-38).

When evaluating the admissibility of evidence under N.J.R.E. 404(b), courts apply the standard adopted by the Supreme Court in State v. Cofield, 127 N.J. 328, 338 (1992), which entails four specific factors:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;

48

2. It must be similar in kind and reasonably close in time to the offense charged[8]

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[Ibid. (internal citation omitted) (emphasis added); see also State v. Barden, 195 N.J. 375, 389 (2008).]

To exclude other-crimes evidence under the fourth Cofield factor, the opposing party only needs to show that the prejudice outweighs—rather than substantially outweighs (as in an N.J.R.E. 403 analysis)—the probative value of the evidence sought for admission. See Green, 236 N.J. at 83-84; see also State v. Rose, 206 N.J. 141, 160 (2011).

In adopting these four factors, the Supreme Court in Cofield instructed that "[t]he inflammatory characteristic of other-crime evidence . . . mandates a careful and pragmatic evaluation by trial courts, based on the specific context in which the evidence is offered, to determine whether the probative worth of the evidence outweighs its potential for undue prejudice." Cofield, 127 N.J. at 334 (internal citations omitted). Even so, our courts have repeatedly made clear that

---

[8] This second prong is not always required. See State v. Green, 236 N.J. 71, 83 (2018); see also State v. Williams, 190 N.J. 114, 131-34 (2007).

"some types of evidence, <u>such as evidence of motive or intent</u>, 'require a <u>very strong showing of prejudice</u> to justify exclusion.'"  <u>Green</u>, 236 N.J. at 84 (emphasis added) (quoting <u>State v. Garrison</u>, 228 N.J. 182, 197 (2017)).

As a safeguard against unfair prejudice, our case law instructs that "limiting instructions must be provided to inform the jury of the purposes for which it may, and for which it may not, consider the evidence . . . ." <u>Rose</u>, 206 N.J. at 161.  Generally, in order for a curative instruction to be considered effective, the instruction should be delivered shortly after the jury hears the offending evidence.  <u>State v. Herbert</u>, 457 N.J. Super. 490, 506 (App. Div. 2019).

In evaluating on appeal a trial court's application of these Rule 404(b) standards, we apply similar deference to the trial court's exercise of discretion as we utilized above in reviewing the evidential rulings about the serologist's findings and the admission of Strickland's police interview under the forfeiture-by-wrongdoing hearsay exception.  <u>See</u> <u>Green</u>, 236 N.J. at 80-81 (employing an abuse-of-discretion review standard).  As the Supreme Court observed in <u>Green</u>, and as we reiterated in <u>Seddens</u>, ___ N.J. Super. at ___ (slip op. at 43), "sensitive admissibility rulings regarding other-crimes evidence made pursuant to Rule 404(b) are reversed '[o]nly where there is <u>a clear error of judgment</u>.'"  <u>Green</u>,

236 N.J. at 81 (quoting Rose, 206 N.J. at 157-58) (alteration in original) (emphasis added). De novo review applies, however, to any pure questions of law presented. Manalapan Realty, L.P. v. Twp. of Comm. of Manalapan, 140 N.J. 366, 378 (1995); Seddens, ___ N.J. Super. at ___ (slip op. at 43).

Applying these principles here, we are satisfied the trial court did not abuse its discretion or engage in a clear error of judgment in admitting the evidence of the knife, bar, and choking incidents under Rule 404(b) as probative evidence of defendant's motive and intent to kill Strickland. The first three factors of the Cofield test are manifestly present, as each of the three previous acts are relevant to motive and intent, they were sufficiently close in time to the homicide (particularly the choking incident), and there is clear and convincing proof of each individual act.

As to the fourth Cofield factor, the trial court had ample justification to weigh the probative value of the three previous incidents more heavily than the risks of undue prejudice with repeated limiting instructions. The incidents substantiate why defendant would be sufficiently enraged and jealous about Strickland and her relationships with others to be incentivized to take her life. They are strong indicia of a motive and intent to kill the victim, and provide an

A-3497-22

appropriate counter-narrative to defendant's benign contention that he discovered Strickland unconscious on the sofa and called 9-1-1 to save her.

We discern no abuse of discretion by the trial court in disallowing the defense from attempting to impeach Strickland as a deceased declarant under N.J.R.E. 806 because the State had previously charged her with wrongful conduct in the knife incident. The timing undermines defendant's proffer.

By the time the police had interviewed Strickland on March 31, 2010, that matter had been resolved without any lingering criminal charges against her. The August 2009 knife incident allegations against Strickland were resolved "within a month or so of the initial charge" after a more thorough police investigation. In considering the admissibility of the charges against Strickland, the trial court was reasonably persuaded by fact that the charges had been dismissed. Given the non-pendency of the charges at the time of the police interview, the trial court permissibly exercised its discretion to exclude proof of them under N.J.R.E. 403.

Turning to the court's limiting instructions, we note the following pertinent sequence of events. The record reflects that the Rule 404(b) instructions were discussed off the record by counsel with the trial judge prior to an on-the record colloquy on January 10, 2023. The judge at that time placed

in front of counsel what she described as an "amalgamation of the various 404B requested instruction[s]." It appears that defense counsel did make some suggested changes prior to appearing that day, which were adopted by the court. As the judge stated:

> Based on what was submitted to me and based on what [defense counsel] also replied I did somewhat alter some of the proposed language that the State suggested. For instance I struck the language regarding what allegedly happened in the back of Ms. Strickland's car . . . on the ride home from the bar after that incident. It was originally characterized by the State or suggested by the State that it be called an assault on the decedent. [Defense counsel] objected to that. I sustained his objection. And I've altered the language to just call it the defendant's actions while in Pamela Strickland's car on the way home. As opposed to what it said before which was defendant's assault on Lawanda Strickland on the way home. So . . . I agree with [defense counsel], I've taken that out.

> I also altered the suggested language with regard to the phone calls that came back to Ms. Williams after . . . she testified she made a call to Lawanda Strickland's house phone. The defendant answered. According to her testimony, she hung up. She then got a series of phone calls immediately thereafter to her cell phone. Originally the State had characterized those calls as having come from the defendant -- or the breathing -- the heavy breathing that was the voice mail, being the defendant's heavy breathing. . . . I don't know if [defense counsel] objected to that, but I've sanitized that to just say, not after not identifying herself on the phone calls Ms. Williams then received multiple phone calls on her cell phone immediately thereafter was a

voice mail left described as heavy breathing, without attributing that to the defendant.

Those were the alterations. You both have had a copy of the 404B [proposed charge].

Also, on the record and at defense counsel's urging, there was an additional change made to the Rule 404(b) instruction surrounding Martin's testimony, specifically to address the instruction's characterization of defendant's words to Martin as an "objective" threat. The court agreed, and the charge was revised to read "approaching Shamia Martin on the street and directing her to stay away from Lawanda Strickland which Ms. Martin took as a threat."

There is no indication that, following these changes, defense counsel objected to the proposed instructions. Later, the complete proposed jury charges were distributed to counsel one week prior to the final charge conference. The court went through each page and asked counsel for comments or objections. There was a discussion about where to insert the Rule 404(b) charges. The court resolved the charge placement and solicited comments from defense counsel, to which counsel replied that he had none.

The actual Rule 404(b) instructions were presented to the jury twice: first, on January 10, 2023, when the three incidents had all been described in the

54

testimony, and second, on February 14, 2023, in the course of the final charge.

On the first occasion, the charge read, in pertinent part:

> However, our rules do permit evidence of other crimes, wrongs, or acts when the evidence is used for certain specific, narrow purposes.
>
> From Pamela Strickland's testimony the evidence of the defendant's actions at the bar and on the ride home from the bar while in Pamela Strickland's car may be considered for the limited purpose of demonstrating the defendant's jealousy regarding Lawanda Strickland and physical aggressiveness that accompanied that jealousy.
>
> The State has also introduced evidence that the defendant assaulted a man at a bar after he bought Lawanda Strickland a drink and that the defendant punched the back seat of Lawanda Strickland's seat in Pamela Strickland's car on the ride home for the purpose of demonstrating defendant's intent and motive for the murder of Lawanda Strickland.
>
> From Shamia Martin's testimony the evidence that the defendant assaulted Lawanda Strickland inside her kitchen and grabbed the knife [in] the course of that assault, resulting in Lawanda Strickland being cut. And that the defendant approached Shamia Martin on the street and directed her to stay away from Lawanda Strickland which Ms. Martin took as a threat, may be considered for the limited purpose of demonstrating the defendant's jealousy regarding Lawanda Strickland and violence when he would become jealous.
>
> The State has introduced evidence that the defendant assaulted Lawanda Strickland inside her kitchen and grabbed the knife in the course of that

55

assault, resulting Lawanda Strickland being cut and the defendant approaching Shamia Martin on the street and directing her to stay away from Lawanda Strickland which Ms. Martin took as a threat, for the purpose of demonstrating the defendant's intent and motive for the murder for Lawanda Strickland.

From Alexis Williams' testimony the evidence that the defendant answered a phone call made by Alexis Williams to Lawanda Strickland's house phone over the July 4, 2010, weekend, and Ms. Williams receiving multiple phone calls to her cell phone immediately thereafter and receiving a voice mail described as heavy breathing may be considered for the limited purpose of demonstrating the defendant's jealousy and possessiveness of Lawanda Strickland.

The State has introduced evidence that the defendant answered a phone call made by Alexis Williams to Lawanda Strickland's house phone over the July 4, 2010, weekend, and then Ms. Williams received several phone calls immediately thereafter and received a voice mail of heavy breathing for the purpose of demonstrating defendant's intent and motive for the murder of Lawanda Strickland.

Whether this evidence does in fact demonstrate the defendant's intent and motive for the murder of Lawanda Strickland is for you to decide. You may decide that the evidence does not demonstrate the defendant's intent and motive for the murder of Lawanda Strickland and is not helpful to you at all. In that case, you must disregard the evidence. On the other hand, you may decide that the evidence does demonstrate the defendant's intent and motive for the murder of Lawanda Strickland and use it for that specific purpose.

A-3497-22

However, you may not use this evidence to decide that the defendant has a tendency to commit crimes or that he is a bad person. That is, you may not decide that, just because the defendant has committed other crimes, wrongs, or acts, he must be guilty of the present crime. I have admitted the evidence only to help you decide the specific question of the defendant's intent and motive for the murder of Lawanda Strickland. You may not consider it for any other purpose and may not find the defendant guilty now simply because the State has offered evidence that he committed other crimes, wrongs, or acts.

On the second time during the final charge, the court essentially reiterated the same cautions, in almost verbatim language.

I'll now talk to you about other crimes, wrongs or acts.

. . . .

Normally such evidence is not permitted under our rules of evidence. Our rules specifically exclude evidence that a [d]efendant has committed other crimes, wrongs, or acts when it is offered only to show that he has a disposition or a tendency to do wrong and therefore must be guilty of the charged offenses.

Before you can give any weight to this evidence, you must be satisfied that the [d]efendant committed the acts. If you are not so satisfied, you may not consider it for any purpose. However, our rules do permit evidence of other crimes, wrongs or acts when the evidence is used for a certain specific narrow purpose.

. . . .

Whether this evidence does in fact demonstrate the [d]efendant's intent and motive for the murder of Lawanda Strickland is for you to decide. You may decide that the evidence does not demonstrate the [d]efendant's intent and motive for the murder of Lawanda Strickland and is not helpful to you at all. In that case, you must disregard the evidence.

On the other hand, you may decide that the evidence does demonstrate the [d]efendant's intent and motive for the murder of Lawanda Strickland and use it for that specific purpose.

However, you may not use this evidence to decide that the [d]efendant has a tendency to commit crimes or that he is a bad person. That is, you may not decide that just because the [d]efendant has committed other crimes, wrongs or acts he must be guilty of the present crime.

I have admitted the evidence only to help you decide the specific question of the [d]efendant's intent and motive for the murder of Lawanda Strickland. You may not consider it for any other purpose and may not find the [d]efendant guilty now simply because the State has offered evidence that he committed other crimes, wrongs, or acts.

We reject defendant's argument that the timing of the initial charge was unduly delayed and should have been given immediately after the jury heard about the first incident. Defense counsel specifically agreed that the instruction should be combined for all three incidents rather than repeated each time. Any

error in this regard was plainly invited. See State v. Bragg, 260 N.J. 387, 407 (2025).

We also discern no reversible error in the contents of the limiting instructions. The instructions generally track the language of the model charge, Model Jury Charges (Criminal), "Proof of Other Crimes, Wrongs, or Acts (N.J.R.E. 404(b))" (rev. Sept. 12, 2016), making them presumptively proper. See, e.g., State v. Davis, 390 N.J. Super. 573, 594-98 (App. Div. 2007). The instructions appropriately urged and reminded the jurors to consider the evidence of the previous incidents for the specified limited purposes and not as proof of defendant's bad character.

For the first time on appeal, defendant takes issue with a solitary portion of one of the instructions that referred to defendant's past act of "physical aggressiveness," a comment that drew no objection from defendant's trial counsel.[9] Defendant now contends that language conveys an improper inference that he had a propensity to act violently in the past. Although we agree it was imprudent to include that phrase, the charge as a whole repeatedly urged the jury to not use the evidence as proof of a criminal propensity. In general, we must

---

[9] Counsel have not supplied us with a copy of the final jury charge that went into the jury room, and we therefore cannot tell if the language appeared in typewritten form or instead was a slip of the tongue.

consider the jury charge as a whole and not isolated pieces. State v. McKinney, 223 N.J. 475, 494 (2015). We discern no plain error in the inclusion of the inadvertent phraseology. State v. Macon, 57 N.J. 325, 338 (1971). In addition, given the strong evidence of defendant's guilt, including the DNA match and the testimony from numerous prosecution witnesses, any error was harmless.

In sum, defendant has failed to demonstrate sufficient grounds for reversal on the admission and use of the Rule 404(b) evidence and the corresponding jury instructions.

D.

We have considered all of the remaining arguments set forth by defendant's appellate counsel and in defendant's own supplemental brief, including but not limited to the alleged need for an unrequested jury instruction on third party guilt. The arguments all lack sufficient merit to warrant discussion in this already lengthy opinion. R. 2:11-3(e)(2). In short, defendant has failed to demonstrate that his conviction was improper and that he is entitled to a new trial.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-3497-22